IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT HANNING, | ) | Case No. 5:18-cv-1264 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Robert Hanning, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for supplemental security income under Title XVI of the Social Security Act ("Act").  The parties consented to my jurisdiction.  ECF Doc. 11. Because the ALJ supported his decision with substantial evidence and because Hanning has not identified any incorrect application of legal standards, the final decision of the Commissioner must be AFFIRMED.

## II.      Procedural History

On June 10, 2015, Hanning filed applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").  (Tr. 232, 236).[1]  After his claims were denied initially (Tr. 161-166) and on reconsideration (Tr. 171-182), he requested a hearing.  (Tr. 183-184).  Administrative Law Judge ("ALJ") Michael F. Schmitz heard the case on May 5,

---

[1] The transcript is filed as ECF Doc. 10.

2017 (Tr. 53-98) and found Hanning not disabled in an October 4, 2017 decision. (Tr. 11-44). The Appeals Council denied Hanning's request for further review on April 10, 2018 (Tr. 1-3), rendering the ALJ's decision the final decision of the Commissioner. Hanning initiated this action to challenge that decision.

III. **Evidence**

A. **Relevant Medical Evidence**

Hanning suffered a fall and acute left ankle sprain in March 2014. (Tr. 351-352). He also reported that his right wrist was painful from his thumb to his shoulder. (Tr. 404). His physician, Lonna Safko, M.D., observed tenderness at the wrist and over the medial right elbow joint as well as a positive Tinel's sign. (Tr. 406). Dr. Safko diagnosed carpal tunnel syndrome, prescribed nightly Gabapentin, and ordered an EMG nerve conduction study of the right arm. (Tr. 406-407). However, subsequent visits do not mention carpal tunnel syndrome. (Tr. 497-510, 620).

Hanning underwent surgery on April 11, 2014 to repair a ligamentous tissue rupture in the left foot. (Tr. 353-354). He went to the emergency room for complications with surgical wounds following the surgery. (Tr. 356-357, 360, 389). An MRI taken on July 15, 2014 showed mild focal bone marrow edema in the anterior-inferior; anteromedial aspects of the talus and edema in the subcutaneous fat of the distal leg most prominent medially; and irregular, mild edema in the deep subcutaneous soft tissues distal to the lateral malleolus which may be a combination of fibrosis granulation tissue reactive and/or inflammatory/infectious edema. (Tr. 385-386).

Diagnostic imaging studies of Hanning's lungs on May 28, 2014 showed mild chronic changes by slightly increased interstitial markings. (Tr. 387-388).

In October 2014, Hanning tripped on a dog leash and injured his left foot and ankle. X-rays were negative for any acute changes and he was diagnosed with an acute left ankle sprain. (Tr. 367). An electromyography ("EMG") study on October 27, 2014 showed mild to moderate axonal motor sensory polyneuropathy. (Tr. 369).

On January 28, 2015, Hanning went to the emergency room for right knee pain. He weighed 396 pounds. He had antalgic gait on the right. He used crutches for assistance. He had 5/5 motor strength. (Tr. 335). A CT scan of his right knee showed lateral subluxation of the patella and small subchondral cysts along the lateral patellar facets. (Tr. 332). An x-ray was normal. The next day he went to a doctor's appointment for evaluation of his right knee pain. (Tr. 333). At a follow-up visit on February 12, 2015, his physician said that he could return to work on February 20, 2015 with no restrictions. (Tr. 341).

Hanning met with a board-certified nurse practitioner, Elizabeth Carroll, at Coleman Psychiatry on May 19, 2015. He told her that his primary care physician had recommended a cane for use on "bad days." (Tr. 447).

Echocardiograms performed in May 27, 2015 and November 2016 showed normal heart size; normal left ventricular size and regional systolic function with an ejection fraction of 55%; no regional wall-motion abnormalities and no significant valvular abnormalities; and normal diastolic function. Both studies showed a mild to moderate degree of concentric left ventricular hypertrophy and mild systolic dysfunction, consistent with the clinical diagnosis of congestive heart failure. (Tr. 645-646, 752-754). At numerous physical examinations, Hanning had a normal heart rate and rhythm, with no murmurs. (Tr. 501, 514, 540, 669, 678, 721, 747-748). At one ER visit, the physician noted "distant" heart sounds but found regular rate and rhythm. (Tr. 732).

On June 8, 2015, Hanning followed up with his primary care physician. He complained of bilateral leg pain and shortness of breath. He requested a handicap placard and a cane. (Tr. 422). Hanning had normal strength, gait and station. His doctor diagnosed COPD with chronic bronchitis, congestive heart failure, obstructive sleep apnea, and "ankle arthritis." (Tr. 426). She prescribed a cane and a disability placard. (Tr. 427).

Hanning completed a Function Report in June 2015. (Tr. 276-283). At that time, he reported that he had COPD, which made it very hard to breathe, and used a cane due to nerve damage in his legs. (Tr. 276). He was no longer able to work on cars, his hobby, because of breathing problems and an inability to get up and down on the ground. (Tr. 278). He reported using a motorized cart for shopping. (Tr. 279). He indicated feelings of helplessness and worthlessness. (Tr. 280).

On June 23, 2015 at a psychiatric appointment, Hanning reported that he had not used alcohol or cocaine since 2013. Ms. Carroll diagnosed episodic mood disorder, NOS; a cognitive disorder, NOS; cocaine dependence, in full, sustained remission; alcohol abuse, near full remission; and history of noncompliance with treatment. She assigned a global assessment of functioning ("GAF") score of 50. (Tr. 435-439).

On July 9, 2015, Dr. Safko prescribed a wheelchair. (Tr. 510). However, her notes from August 10, 2015 state that Hanning did not qualify for a motorized wheelchair and stated she would check with insurance. (Tr. 516).

Hanning met with Dr. Matthew Krauza, a pulmonologist, on August 5, 2015. (Tr. 720-721). Hanning weighed 432 pounds. Hanning reported shortness of breath with exertion and heat. Dr. Krauza noted that Hanning had been complaining of these symptoms since January 2015. Hanning was already using Symbicort and Ventolin inhalers. Dr. Krauza added Spiriva

and provided a nebulizer for albuterol. Dr. Krauza's examination showed normal, symmetrical lungs and unlabored chest expansion; clear lungs bilaterally to auscultation with good air entry; normal pulse oxygenation at 97 percent on room air; and normal breath sounds without any audible wheezing, rales, or rhonchi. His extremities did not have any cyanosis or clubbing. (Tr. 721).

On August 24, 2015, an exercise pulse oximetry six-minute walking test showed that Hanning walked 935 feet, and experienced some shortness of breath necessitating the use of his albuterol inhaler. He had no recorded oxygen desaturation events below 94 percent (on room air) and maintained oxygen saturation of blood at 96 percent for more than 50 percent of the testing. (Tr. 671-673). On August 28, 2015, a CT angiogram of Hanning's chest showed no evidence of central pulmonary embolus but findings suggestive of pulmonary hypertension and underlying obstructive lung disease. (Tr. 496).

Physical therapist, Michele Templeton, examined Hanning on September 9, 2015. She noted upper extremity pain and weakness, along with observations of pain and discomfort in the wrists and hands. (Tr. 524-525). She noted complaints on grip strength testing, recorded some degree of weakness in both wrists and noted painful but full range of motion in both wrists. Sensation was intact to light touch. Ms. Templeton noted intact upper extremity/hand function to operate controls. (Tr. 527).

Hanning requested a motorized wheel chair on August 10, 2015. (Tr. 511). Ms. Templeton evaluated him on September 14, 2015 and completed a form for him to obtain a power wheelchair. She stated that he needed a heavy-duty power wheelchair due to his body weight and symptoms of other medical conditions including shortness of breath that increased

with physical activity and pain from osteoarthritis. (Tr. 487-491, 524-528). Dr. Krauza's signature appears on a copy of this form indicating his agreement with its contents. (Tr. 528).

In October 2015, Hanning met with neurologist, Joshua Gordon, M.D., for leg pain. Hanning weighed 442 pounds. (Tr. 540). Dr. Gordon observed normal muscle bulk and strength. Hanning's gait was antalgic. Dr. Gordon noted decreased sensation to pinprick at the lateral dorsal aspect of the right foot, but normal sensation to pinprick at the medial right foot, and otherwise normal sensation. (Tr. 540-541).

A pulmonary function test performed on November 12, 2015 in connection with Hanning's applications for disability benefits showed signs of obstruction that improved with bronchodilator therapy. (Tr. 607). Yolanda Duncan, M.D., interpreted the spirometry report as showing severe airway obstruction, with low vital capacity. She noted that the post bronchodilator test was markedly improved. (Tr. 612).

Hanning met with pulmonologist, Brian White, on November 18, 2015. White's examination showed normal, symmetrical lungs and unlabored chest expansion; clear lungs bilaterally to auscultation with good air entry; normal pulse oxygenation at 97 percent on room air; and normal breath sounds without any audible wheezing, rales, or rhonchi. His extremities did not have any cyanosis or clubbing. Hanning asked about getting his disability paperwork filled out, but Dr. White told him that he would not qualify for disability or for public assistance from a lung function standpoint. (Tr. 669).

Hanning underwent a pulmonary function test in November 2015. (Tr. 606-607). He put forth a fair effort but with poor reproducibility. The administering physician assessed moderate obstruction, improved with bronchodilator. (Tr. 607).

In December 2015, Hanning complained of shortness of breath, low back pain and left leg swelling. (Tr. 620). His list of prescriptions included a large wheelchair and a four-prong cane. (Tr. 623).

Neurologist Roswell Dorsett, D.O., examined Hanning in February 2016 for sensory polyneuropathy, back pain and hip pain. He referred Hanning to pain management. (Tr. 741-742). Hanning followed up with Dr. Dorsett in March 2016. Hanning weighed 452 pounds. Dr. Dorsett observed normal strength, coordination and gait. (Tr. 629, 739).

A psychiatric visit at Coleman on August 9, 2016 states that Hanning was in court-ordered anger management. He reported that he was waiting for his motorized wheelchair, which had been approved. (Tr. 647).

Hanning is morbidly obese with BMI's ranging from 50 to 60. (Tr. 334, 669, 731, 752). His pulmonologist referred him to a bariatric surgeon. On August 11, 2016, he saw Dr. Archana A. Gorty, a bariatric surgeon. She opined that he would be considered for surgery if his baseline ECG was normal or stable and if he had no intermediate clinical risk factors. (Tr. 679).

Hanning saw podiatrist, Richard Rasper, D.P.M., on March 2, 2017. Hanning reported pain and numbness/tingling in the left ankle. (Tr. 736). He reported pain in the sinus tarsi, suggestive of possible neuritis and sinus tarsi syndrome of the left ankle in addition to posttraumatic osteoarthritis. (Tr. 736-737). Dr. Rasper observed normal gait, no gross orthopedic deformities and no contractures at the affected area, and present pedal pulses bilaterally with normal capillary refill. Hanning was instructed to get the left ankle x-rayed. (Tr. 737).

Hanning returned to Dr. Dorsett on March 13, 2017. (Tr. 734). He was "refused by pain management." He had some benefit with an increased dose of Lyrica. Dr. Dorsett continued to

observe normal strength and coordination. Hanning was ambulating with a cane. Dr. Dorsett prescribed a lift chair. (Tr. 734).

### B. Opinion Evidence - State -Agency Reviewing Physicians

Dr. William Bolz reviewed Hanning's records on August 17, 2015 and opined that he was able to perform work at the light exertional level. (Tr. 106-107).

Dr. David Knierim reviewed Hanning's records on November 17, 2015 and agreed with most of the opinions of Dr. Bolz. He added the restriction that Hanning should avoid concentrated exposure to dusts, gases, fumes, odors and poor ventilation due to COPD. (Tr. 151-153).

### C. Testimonial Evidence

#### 1. Hanning's Testimony

Hanning testified at the administrative hearing on May 5, 2017. (Tr. 59- 88, 97). Hanning was born on October 16, 1979 and was 37 years old at the time of the hearing. (Tr. 59). He is 6'1" and weighed 452 pounds. He lived in a mobile home with his girlfriend and two dogs. He did not walk his dogs. His home had three steps and it was difficult for him to use them. (Tr. 60, 87-88). His girlfriend drove him to the hearing. He had not driven for a couple of years. (Tr. 61).

Hanning graduated from high school. He last worked in January 2015 as a tow truck driver. (Tr. 62). He could no longer work due to COPD; not being able to walk very far; his weight; congestive heart failure; carpal tunnel syndrome; not being able to pick up very much; and not being able to use his manual wheel chair. (Tr. 68).

Hanning used three different inhalers and a nebulizer machine for his COPD. He also used a sleep apnea machine at night. He slept six to seven hours every night with sleep-aid medication. (Tr. 69).

During the day, Hanning watched TV. He was able to walk about ten steps with a four-prong cane. (Tr. 70-71). With the use of his cane, he was able to stand for five to eight minutes at a time. (Tr. 87). He was able to shower and dress himself. (Tr. 84). He was able to go to the grocery store. He used a motorized scooter to shop. (Tr. 83).

Hanning's blood pressure was controlled with medication. He wore compression stockings for neuropathy in his feet. He used a power lift chair to keep his feet elevated at home. (Tr. 72). He was also treating for knee pain. His doctor was working to resolve his problems with his legs before proceeding with carpal tunnel release surgeries. (Tr. 73-74). Hanning was diagnosed with renal disease. He took water pills for this condition but would probably need to do dialysis in the future. (Tr. 81). Hanning was also treating for depression and anxiety. He got along with his former co-workers and his physicians. (Tr. 80).

Hanning previously abused alcohol and cocaine during his divorce, but hadn't used either since 2009. (Tr. 75). He quit smoking after he was diagnosed with COPD. (Tr. 76).

Hanning was considering bariatric surgery. He was scheduled to have his stomach stapled, and 18 months later to undergo a gastric bypass surgery. He was on a diet in preparation for the surgery. (Tr. 78).

### 2. Vocational Expert's Testimony

Vocational Expert ("VE"), Daniel Simone, also testified during the hearing. (Tr. 88-96). The VE considered Hanning's past work to be that of a tow truck operator. (Tr. 90). He testified that an individual of Hanning's age, education, and work experience, who could work at the

sedentary exertional level; who was limited to occasional pushing and pulling and occasional foot controls; frequent handling and fingering; who could not climb ladders or scaffolds; could occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch and crawl; who must avoid unprotected heights, concentrated exposure to dust, odors, fumes and pulmonary irritants, and extreme cold, heat and vibration; who was limited to simple, routine and repetitive tasks, but not at a production rate; who could occasionally respond appropriately to change in a routine setting, as long as such changes were gradually introduced, and easily explained and/or demonstrated in advance; who would be able to interact frequently with supervisors and co-workers, but on an incidental and superficial basis with the general public; could not do sales, arbitration, negotiation or conflict resolution, group tasks, manage or direct others, would not be able to perform Hanning's previous job. (Tr. 90-91). However, the VE opined that this individual would be able to perform the jobs of call out operator, document worker or preparer, and sorting or inspecting. There were significant numbers of all of these jobs available in the national economy. (Tr. 91-92). The individual would still be able to perform these jobs if he used a four-prong cane or a wheel chair. (Tr. 94-95). But, he would not be able to perform these jobs if he needed to keep his feet elevated at hip-height throughout the day. (Tr. 95).

The ALJ then asked the VE to consider the same hypothetical individual with the added restrictions of rarely pushing, pulling, using foot controls, climbing ramps or stairs, balancing, stooping, kneeling, crouching or crawling. (Tr. 92). The VE opined that this individual would be able to perform the same jobs as the first hypothetical individual. However, if the individual were limited to only occasional use of the hands, he could not perform any jobs. (Tr. 93).

IV.    **The ALJ's Decision**

The relevant portions of the ALJ's decision (Tr. 11-44) are paraphrased below:

5.  Hanning had the residual functional capacity to perform sedentary work, except that he could rarely push and/or pull, including the operation of foot controls, with the lower extremities; he could frequently operate hand controls with the upper extremities; he required the use of a "quad" (four-pronged) cane for supporting the maximum 2 hours of standing and/or walking of an 8-hour workday of sedentary work; which cane he would need to hold in his dominant hand; and he could never climb ladders or scaffolds; could rarely climb ramps and stairs; could rarely balance, stoop, kneel, crouch and crawl; could frequently handle and finger items; must avoid all hazards in the workplace, such as unprotected heights, concentrated exposure to temperature extremes, to vibration, dust, odor, fumes and pulmonary irritants; could perform simple, routine and repetitive tasks, but not at a production rate of pace; could respond appropriately to only occasional changes in a routine work setting, with any such changes needed to be gradually introduced and easily explained and/or demonstrated in advance; could frequently interact with supervisors and coworkers, but could interact with the general public only on an incidental and superficial basis, with no sales, arbitration, negotiation, conflict resolution, group tasks, or management or direction of others.  (Tr. 23).

10.  Considering Hanning's age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that he could perform.  (Tr. 42).

Based on all his findings, the ALJ determined that Hanning had not been under a disability from January 1, 2014, through the date of his decision.  (Tr. 43).

## V.  Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g).and 1383(c)(3). The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen,* 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal standards. If not, reversal is required unless the legal error was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was

discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

In considering an application for supplemental security income or for disability benefits, the Social Security Administration must follow a five step sequential analysis: at Step One, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step Two, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step Three, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step Four, the Commissioner determines whether the claimant can still perform his past relevant work; and finally, at Step Five, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. §404.1512(a).

### B. Motorized Wheelchair Form

Hanning argues that the ALJ erred by failing to state valid reasons for rejecting the form requesting a motorized wheelchair signed by Dr. Matthew Krauza. ECF Doc. 12 at 12-20. This form was completed by Ms. Templeton, a physical therapist, and its purpose was to request a motorized wheelchair for Hanning. The form appears twice in the record: the first copy is signed

by only Ms. Templeton (Tr. 487-491); the second copy is a duplicate signed also by Dr. Krauza. (Tr. 524-528). Hanning argues that the ALJ should have assigned more weight to some of the statements in the form. For example, Ms. Templeton wrote that Hanning could not "ambulate functional distances" due to shortness of breath from COPD, bilateral leg pain and overall instability. "The receipt of a power [wheelchair] would allow him to be safe, [to increase] mobility in his home and allow him to participate more in his [independent activities of daily living]." (Tr. 488).

The ALJ thoroughly discussed the motorized wheelchair form in his decision. He recognized that Ms. Templeton found that Hanning had a medical necessity for the wheelchair due to shortness of breath that increased with activity, lower extremity pain, and upper extremity pain and weakness. "She observed very limited 'functional status' in terms of ambulating just 24 feet with 'significant antalgia' and stiff-legged gait, and she recorded signs of fatigue on such activity and some decreased muscle strength (4/5) in the lower extremities (Ex. 8F/2). The ALJ also recognized that Dr. Krauza signed the form. The ALJ stated:

> I acknowledge that one of his treating physicians – his first pulmonologist, Dr. Matthew Krauza – did "sign off" on September 22, 2015 to Ms. Templeton's "Seating/Wheeled Mobility Letter of Medical Necessity: Power Wheelchair and/or any Custom Wheelchair" form (*see* Ex. 8F/5); but I must return to that physician's clinical findings and to the many other treating physicians' clinical observations for full and normal strength in the lower extremities, normal sensation, and normal gait and station, which are not consistent with the need for a motorized or even regular wheelchair to support standing and/or walking for no more than two combined hours of an eight-hour workday.

(Tr. 34).

In considering Hanning's ability to ambulate, the ALJ found that his four-pronged cane was medically necessary, but that a wheelchair was not. The ALJ supported his decision as follows:

Considering both the obesity and the effects of other severe impairments on the claimant's lower extremities, I carefully reviewed the longitudinal medical evidence with a focus given to his alleged use of both a four-prong cane and a wheelchair. I found no references to any assistive devices in any documented medical treatment over the year 2014. However, Dr. Lonna Safko's records contain documentation that she had prescribed the four-prong (and a "disabled" parking placard) on June 8, 2015, on the basis of his diagnosis of "neuropathy" (Ex. 3F/26-27; 7F/9; 12F/8). Dr. Safko also wrote a prescription for a "large wheelchair" on July 9, 2015, which was premised on the diagnosis of COPD but did occur in connection with his presenting complaints of having fallen twice when in the grocery store (Ex. 7F/17). Thus, Dr. Safko's records clearly document that the claimant received both the cane and the wheelchair on a prescribed basis.

The cane appears in both subjective reports over May-June 2015 psychiatric progress visits at Coleman Behavioral Health and by July 2015 his psychiatric nurse practitioner directly observed he had used a "quad cane" in the office and ambulated with a slow, steady gait (Ex. 3F/19, 12; 10F/32). After that point, however, any medical observations that the claimant arrived at treatment facilities in a wheelchair or even ambulating with the quad cane are lacking. Numerous 2015-2016 medical visits reflect neither medically observed use nor reported need to use the cane or wheelchair (*see, e.g.,* Ex. 21F/1; 15F/2; 17F/5; 20F/9). As discussed above, almost all of those medical office visits report that he ambulated with a normal gait and stood at normal station. In the July 2016 bariatric surgery consult, Mr. Hanning reported that he uses a cane, but he was observed to walk unassisted (Ex. 16F/31, 4).

The cane reappears at some later treatment visits, including Dr. Dorsett's March 2017 office visit that noted he ambulated with a cane at that time (20F/1-2).

Reviewing the evidence in a light most favorable to the claimant, I did find in post-hearing review enough support for finding a medically necessary use of the quad cane to support standing and walking, which was reflected in his attorney's questions to the vocational expert at the May 2017 hearing, and accordingly added this impairments-caused limitation in standing and walking abilities to the foregoing residual functional capacity assessment. On the other hand, there is simply no evidence to support the same medical necessity for a wheelchair since it was not observed as actually used over the course of 2015-2017 medical treatment.

(Tr. 33). The ALJ provided a thorough analysis of Hanning's use of a four-pronged cane and the wheelchair. Interestingly, Hanning doesn't argue that he regularly used a wheelchair. Rather, he argues that the ALJ should have accepted the physical therapist's notes from the motorized

wheelchair form as evidence that he required the use of a wheelchair, despite the fact that he wasn't regularly using one.

The next question is whether the motorized wheelchair form should be considered an opinion from a treating physician. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) provides that a medical opinion "reflect[s] judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." Hanning has not shown that the motorized wheelchair necessity form included opinions about what he could still do despite his physical impairments. Thus, it is questionable whether this form can even be considered a treating physician opinion or whether the ALJ even had a duty to give "good reasons" for the weight assigned to this form. *Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007). *See also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007) (noting that a treating source's general findings are relevant, but not controlling without a specific RFC assessment). The purpose of this form was to request a motorized wheelchair, not to provide an opinion regarding Hanning's functional abilities.

Nevertheless, the ALJ considered the form and stated why he did not assign controlling weight to the statements made in it. He compared it to Dr. Krauza's clinical findings and the other treating physician's clinical observations and determined that the findings in the form were inconsistent with the medical record as a whole. The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)[2]) (internal quotation

---

[2] The regulation applicable to SSI claims, 20 C.F.R. § 416.927, is identical to the regulation cited in *Wilson*.

marks omitted). Here, the ALJ found that the opinion was not well supported by the record. The ALJ noted that there were many observations in the record of full and normal strength in the lower extremities, normal sensation, normal gait and normal station. The ALJ also explained that there was little evidence that Hanning was even using a regular wheelchair. (Tr. 34).

Hanning argues that the ALJ's discounting of the motorized wheelchair form impacted his evaluation of Hanning's obesity. Social Security Ruling 02-1p, 2002 SSR LEXIS 1 provides, in part:

> [W]e will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

SSR 02-1P (S.S.A.), 2002 SSR LEXIS 1, 2002 WL 34686281.

Here, the ALJ determined that Hanning's obesity was a severe impairment and recognized that it resulted in work-related functional limitations. (Tr. 15, 32). The ALJ dedicated two and a half pages of his decision to the discussion of Hanning's obesity. (Tr. 32-34). He considered it in relation to Hanning's functional abilities, including his mobility with the four-pronged cane. (Tr. 32, 34). Hanning has not shown that the ALJ provided an inadequate evaluation of his obesity. A severe obesity finding does not automatically mean a person has functional limitations. Severe obesity, in combination with other impairments, may serve as a "risk factor" in developing or complicating other impairments. Social Security Ruling 02-1p, 2002 SSR LEXIS 1 directs:

> Neither do descriptive terms for levels of obesity (e.g., "severe," "extreme," or "morbid" obesity) establish whether obesity is or is not a "severe" impairment for disability program purposes. Rather, we will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe.

*Id.* Per the regulations, obesity does not necessarily impact other impairments and must be evaluated on a case-by-case basis. As the Sixth Circuit stated in *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 412 (6th Cir. 2008), "[i]t is a mischaracterization to suggest that Social Security Ruling 02-1p, 2002 SSR LEXIS 1 offers any particular mode of analysis for obese disability claims." Here, the record shows that the ALJ considered Hanning's obesity in accordance with SSR 02-1p, 2002 SSR LEXIS 1. The ALJ discussed Hanning's obesity and stated that he had fully considered it when arriving at the exertional limitations, and environmental limitations. In considering how obesity affected Hanning's lower extremities, the ALJ stated, "I carefully reviewed the longitudinal medical evidence with a focus given to his alleged use of both a four-prong cane and a wheelchair." (Tr. 32). The ALJ's ultimate decision denying benefits was based on substantial evidence, considering Hanning's obesity. Hanning's argument that the ALJ did not properly evaluate his obesity in light of the motorized wheelchair form is not well taken.

Next, Hanning argues that the ALJ substituted his own medical judgment for that of the treating physician. However, it does not appear that the ALJ based his RFC determination on his own interpretation of the raw medical data. Rather, the ALJ thoroughly discussed the medical evidence, including medical opinions in the record, as well as Hanning's statements when determining his RFC. An ALJ is required to consider all the evidence and resolve conflicts in the medical evidence. *See Hardaway v. Sec'y of HHS,* 823 F.2d 922, 927 (6th Cir. 1987). As previously stated, the ALJ explained his decision that the opinion expressed in the motorized wheelchair form was not consistent with the medical evidence as a whole. His decision was supported by substantial evidence from the record. It does not appear that the ALJ interpreted

raw medical data. Rather, it appears that he considered all of the evidence and weighed it in accordance with the regulations.

Finally, Hanning argues that the ALJ contradicted himself by finding that Hanning did not meet Listing 1.02A, by finding there was no evidence supporting his inability to ambulate effectively, but later recognizing his need for a four-prong cane. (Tr. 18). The ALJ considered listing 1.02(A) and its criteria of an "inability to ambulate effectively" within the definition of Section 1.00B2b. (Tr. 18-19). As he noted, ineffective ambulation is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device that limits the functioning of both upper extremities. The primary example given is the inability to walk without the use of a wheeled walker, two crutches, or two canes. Because the ALJ found that it was not medically necessary to use a wheelchair or any of those devices, he found that the definition in Section 1.00B2b was not met. Hanning required use of *one* four-prong cane, which limited the use of *one* upper extremity, not both. (Tr. 18-19). Substantial evidence supported the ALJ's decision regarding listing 1.02A, and his decision was adequately explained. Hanning's argument that the ALJ contradicted himself is not well taken.

Substantial evidence supported the ALJ's decision to assign little weight to the motorized wheelchair form. The ALJ properly evaluated and explained his evaluation of Hanning's obesity. The ALJ did not interpret raw medical data. Rather, it appears that he considered the evidence as a whole, including the medical opinions, and Hanning's statements. The ALJ did not err in considering whether Hanning met listing 1.02A. He explained his finding that Hanning's use of the four-prong cane limited the use of only one of his upper extremities.

Hanning has not identified any legal error in relation to the ALJ's evaluation of the motorized wheelchair request form.

### C. Credibility

Hanning next argues that the ALJ erred in finding that his testimony was not fully credible and was not supported by objective evidence in the record. Specifically, Hanning cites the wheelchair request form arguing that the ALJ failed to recognize that his testimony was consistent with this record. ECF Doc. 12 at 20-21. It is for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including the claimant. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997); *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981). However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." Soc. Sec. Rul. 96-7p, 1996 WL 374186, at * 4. Rather, such determinations must find support in the record. Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must determine the claimant's credibility concerning his or her complaints "based on a consideration of the entire case record." *Rogers v. Comm'r of Soc. Sec.* 486 F.3d 234, 247 (6th Cir. 2007). The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. The ALJ must scrutinize the consistency of the various information in the record. Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect. *Id*.

Social Security Ruling 96-7p also requires the ALJ to explain his credibility determination. It "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* In other words, blanket assertions that the claimant is not believable are inadequate, as are credibility findings that are not consistent with the entire record and the weight of the relevant evidence. *Id.*

At several places in his decision, the ALJ discussed his credibility assessment. For example, he found that Hanning's statements regarding his COPD symptoms were not fully credible because Hanning reported to treating physicians and other medical sources that the nightly use of his C-PAP machine effectively treated his condition and improved his nightly sleep to eight hours. (Tr. 27). He noted that Hanning's testimony of constant swelling in the lower extremities from congestive heart failure was not supported by the longitudinal medical evidence. (Tr. 28). The ALJ also compared Hanning's testimony with notes from his bariatric surgery consultation where he stated that he walked to and from his mailbox without difficulty; could walk up two flights of steps without symptoms; could carry groceries into his house; and could carry laundry. The ALJ found that Hanning's testimony was inconsistent with these treatment notes and that Hanning's ability to function was not as limited as he alleged. (Tr. 37, 675). The ALJ thoroughly evaluated the wheelchair request form and explained why he did not assign greater weight to the statements made in this form. (Tr. 33-34). He was required to evaluate Hanning's credibility in light of all the evidence in the record, not based only on a single form. As already stated, it is for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including the claimant. Here, the ALJ thoroughly assessed ALJ's

functional abilities and his credibility; he cited support for his assessment. For these reasons, the ALJ's credibility assessment must be affirmed.

### D.     Step Five Burden

Finally, Hanning contends that the ALJ did not meet his burden at Step Five of the sequential analysis because he failed to consider the fact that sedentary work requires a person to stand and/or walk for up to two hours per day. ECF Doc. 12 at 23. During the hearing, the VE identified jobs that Hanning could do that did not have specific job activities done with standing or walking. (Tr. 90-95). Based on this, Hanning argues that the VE's testimony was inconsistent with the definition of sedentary in the regulations and the ALJ should not have relied on it. ECF Doc. 12 at 22-23.

At Step Five of the sequential analysis, the burden shifts to the Commissioner to produce evidence supporting the contention that the claimant can perform a significant number of jobs in the national economy. *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. § 416.920(a)(4)(v). An ALJ may determine whether the claimant has the ability to perform work in the national economy by applying the medical vocational guidelines. 20 C.F.R. § 416.969; 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00. The medical-vocational guidelines establish matrices that correlate variables – including the claimant's RFC, age, educational background, and previous work experience. See generally 20 C.F.R. Pt. 404, Subpt. P, App. 2. When these variables are entered into the appropriate matrix, a finding of disabled or not disabled is directed. *Id.* Nevertheless, the medical-vocational guidelines "do not cover all possible variations of factors." 20 C.F.R. § 416.969. When a claimant's particular characteristics do not coincide with a rule's corresponding criteria, such as when a claimant is unable to perform the full range of a category of work, the medical-vocational guidelines do not

direct a conclusion of disabled or not disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a), (d).

Alternatively, an ALJ may determine that a clamant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs. *Howard,* 276 F.3d at 238. A vocational expert's testimony in response to a hypothetical question provides substantial evidence when the question accurately portrays the claimant's RFC. *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations"). "An ALJ is only required to incorporate into a hypothetical question those limitations he finds credible." *Lee*, 529 F. App'x at 715; *see also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

Here, the VE testified that someone with Hanning's RFC would be able to perform specific jobs in the national economy. (Tr. 90-94). He testified that his testimony was consistent with the *Dictionary of Occupational Titles* and his own experience. (Tr. 94). When questioned by Hanning's attorney, the VE stated that the jobs he had identified did not require standing or walking during tasks. Rather, standing and/or walking were required in these jobs to get from point A to point B. (Tr. 95). The ALJ was permitted to rely on this testimony at Step Five as substantial evidence supporting his decision. *Howard,* 276 F.3d at 238.

Hanning seems to conflate the different evidence upon which an ALJ may rely at Step Five. He argues that, by finding that he was capable of a limited scope of sedentary work, the ALJ necessarily found that Hanning was capable of standing and/or walking for up to two hours a day. This argument is not well taken. The ALJ's RFC determination included a finding that Hanning required a four-prong cane in his dominant hand. This was communicated to the VE during the hearing and the VE determined that there were still jobs that Hanning could perform. (Tr. 94). The ALJ was permitted to rely on this as substantial evidence at Step Five.

## VI. Conclusion

The ALJ properly considered the motorized wheelchair request form, the medical opinions and the record as a whole. He provided adequate explanations for his decisions, including his credibility assessment of Hanning. The VE's testimony provided substantial evidence supporting the ALJ's decision at Step Five. Because the ALJ's decision was supported by substantial evidence and because Hanning has not identified any incorrect application of legal standards, the final decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

Dated: May 3, 2019

Thomas M. Parker
United States Magistrate Judge